May it please the Court, I'm Kevin McEwen, Counsel for the California Attorney General and for the California Parties. I understand I'm supposed to keep my own tie, but my intent is to reserve five minutes for rebuttal. We're here today because FERC failed to comply with this Court's mandate in Lockyer. This Go back and look at the actual market-based rates that sellers charged California during the energy crisis, but that they failed to report to FERC in the required quarterly reports, and determine whether those rates were just and reasonable. And if they were not just and reasonable, consider whether you should grant refunds. FERC says that it complied. It did not. This Court said FERC may not rely solely on its preliminary market-power screen to determine whether market-based rates are just and reasonable. On remand, FERC said FERC may rely solely on its preliminary market-power screen to determine whether market-based rates are just and reasonable, so long as it reruns the same screen after the sale and the seller passes the screen. This Court said FERC must look at the actual rates charged to gauge whether the rates were just and reasonable, and that markets were not subject to manipulation. On remand, FERC said there's no need to look at the actual rates charged, and we're certainly not going to permit evidence on market manipulation. This Court said FERC may not treat failure to file transaction reports as a technical compliance issue, because compliant transaction reports are essential, integral, crucial to the market-based rate system, and that pragmatically without them, there is no filed tariff in place at all. On remand, FERC said even assuming the California parties were correct that every single seller failed to file compliant quarterly reports, that fact is irrelevant if the seller passes the screen when we rerun it. So for sales during the crisis, failure to file compliant quarterly reports was and remains a technical compliance issue, notwithstanding this Court's mandate. What FERC has done on remand is not compliance with the mandate. It is thinly-veiled defiance of the mandate, and it fails to satisfy the requirements of the Federal Power Act and of reasoned decision-making. Now, FERC will say it does, in fact, look at the actual rates charged. And then when it looks at those rates, it looks for indicia of market power. And if it finds indicia of market power, it holds a hearing to determine whether there was actually market power. And at the hearing, however, there's no need to bother looking at the actual rates charged to decide whether those actual rates were just and reasonable. FERC just reruns the preliminary screen. And if the seller passes, FERC is entitled to presume that the rates that were actually charged were just and reasonable. So according to FERC, the only purpose of knowing the actual rates charged is to decide whether to rerun the preliminary screen to see if the anti-competitive market outcomes that in this case everybody knows actually occurred were theoretically possible. What FERC is describing is a fantasy world in which what actually happens is ignored because it differs from what the screen says ought to happen. It's like refusing to believe that it's raining even though you feel raindrops on your fingers because the forecast was for passing a driving test before he got his license and they administered the driving test after he was caught speeding. What FERC has done is irrational. And FERC should have understood that this Court's decision in Lockyer required something different. The opinion was full of contextual clues that FERC should have appreciated. For example, the Court understood and said in the opinion that the rates during the crisis were not just unreasonable. In fact, the Court was repeating what FERC had said in its own opinions. The Court said rates during the crisis were not just unreasonable in part due to market manipulation. The Court said most, if not all, sellers had failed to file compliant quarterly reports. And again, most of these things that the Court was saying in its opinion were things that FERC had said. The Court also said that rates during the crisis were at a high level, were out of control, even though everybody knew that every seller who was charging these rates had already passed the preliminary screen. The Court also likely understood, and FERC surely understood, that there wasn't any seller, and certainly none of the power marketers who were left in this case, who would have failed the preliminary screen if it was rerun as of the time the seller made the sales to California that are the sales at issue here. So when this Court remanded to FERC, there was little doubt what FERC was supposed to do. It was supposed to see if sellers had failed to file compliant quarterly reports. It was supposed to determine whether the actual rates charged that should have been reported in those reports were just unreasonable. And it was supposed to consider refunds. And although the California parties in 2004 asked the Court to order FERC to order FERC in the first instance to decide that issue. So given the context, what FERC did on remand here is not only inconsistent with the Court's mandate, it is obviously wrong, and it's inconsistent with any notion of reasoned decision-making for three reasons. First, the preliminary screen is completely useless for what this Court called step two, the essence of the Lockyer opinion, analyzing the actual rates that are just and reasonable. And it's useless because it doesn't tell what actually happened in the market. Whenever it's run, it only forecasts what ought to happen in the market. It's just like redoing the driver's test can't tell whether the driver was speeding. It's just not designed for that purpose. The quarterly reports, if filled out correctly, reveal what actually happened. So all you need to do is contrast the information examined in the preliminary screen with what's reported in the quarterly report to see that they are different tools that use different information for different purposes. The screen looks only at uncommitted generation capacity, owned or controlled, and it assumes that if it's less than 20 percent of the available generation in the entire market, the seller cannot exercise market power. That's the assumption behind the screen. The quarterly report, on the other hand, looks at the details of actual transactions, buyer, price, quantity, delivery point, product, date. There's no overlap between the two pods of information. We have a Venn diagram in our opening brief at page 38 that illustrates this point. They're completely different sets of information. This Court understood that in Lockyer, and this Court said it's nice that we did this preliminary screen, but what's essential is that you look at the actual rates charged. Those are the things that are in the quarterly reports, and that's what you, FERC, didn't do, so we're sending it back. And FERC still hasn't done it. Second, what FERC says it does with the quarterly reports, that is, just simply look at them to see whether there are indicia of market power, and then if there are, it goes and reruns the screen. Well, it never does that. It's never done that. It – FERC has made it up for this case to deny us relief. It's just not the way FERC practices. All you need to do is look at other cases, even in this California refund case series of cases, to see that that's true. For example, in the refund period, this Court, in the 2006 CPUC decision, reviewed what FERC had done. And in that case, what FERC had done was look at the actual rates charged in the market. It decided in a November 2000 order that you quoted in your Lockyer opinion that the rates were probably unjust and unreasonable, and there were going to have to be further analysis, and there might be refunds. But there was no mention of rerunning this screen to make that determination. It just wouldn't have occurred to anybody, because that's not what FERC does. The same is true with the summer period. This Court remanded in the CPUC case for FERC to hold a hearing as to whether there was market manipulation during the summer period or other illegal activity, and FERC has had that hearing. And we sent you a 28J letter with the opinion in which FERC found that there was massive market manipulation, tens of thousands of tariff violations that had clear price effects raising the price. But there was never a mention in any aspect of that case that the idea was to rerun the preliminary screen to see whether sellers had market power. No. We got actual evidence of market manipulation and other things that indicated market power. FERC was not interested in, nor did it look at, a rerun of the screen. From the parties' briefs, I mean, I see the disconnect, you argue, between what could be market power and the market share test and not having a congruence, and also between how one might determine whether something is unjust and unreasonable, but that certain evidence ought to be admissible in order to make that calculation, such as market manipulation details. So we have a lot of things kind of floating around, and your argument is that FERC didn't follow our mandate, which we'll have to figure out. So let's just imagine that FERC did not follow, and if that's true, then apparently we weren't clear. So what, in your view, is the procedure in a kind of a cookbook form that FERC ought to follow were it to follow the mandate as you interpret it? Your Honor, what ought to happen, I think, is that if — and it's what FERC would do if it got a complaint against existing rates. It would — it would look at the determination as to whether the actual rates charged appeared to be reflecting something other than a competitive outcome in the market. There are various tests that can be used to do it, but all of the tests that would be used to do it have information in them of the type that's in the quarterly reports, because that's the information that you need to look at to see whether actual rates are a problem. And so — but in this case, FERC already has a ready-made solution to this. Right. I understand that. So what I'm asking, because you then said, well, of course, this information, if you appropriately look at the quarterly reports, then you can divine in some cases market manipulation and other various, what I'll call, anomalies. Yes, Your Honor. Anomalies in the market, I'll call it. Yes. You can see, for example, price discrimination. Right. Price discrimination. Because the reports have in them both the sellers or the filers' purchases and the filers' sales. So you can track the — So my specific question then is, you know, obviously there were proceedings below, and different sides argued how they thought FERC might maybe, you know, in their briefs how this was going to happen. But now we're at a new stage, and we either will affirm or we would have other options. If it were to go back, what — what is your characterization then on how FERC needs to use the quarterly report information? Well, Your Honor, I think the primary thing that FERC should do, consistent with this Court's opinion in Lockyer, is to go back and find out, establish clearly which sellers failed to file compliant quarterly reports. I think what this Court said in Lockyer — And I think they can almost stop there, because once they have that information, I think what this Court's Lockyer decision says is that by definition means that the rate charged was unlawful. It doesn't mean that there's going to be a refund. It means that the rate charged was unlawful because the seller didn't complete the second step of the process by filing the report as it was required to do. And so FERC would then decide whether the rate that was charged was just and reasonable. That also doesn't mean that there's going to be a refund. It's going to make that decision. Now, what we know is that in this period, rates were unjust and unreasonable in many ways for many time periods and for many sellers. Again, what FERC has done on the pen — Let me just interject one potential intermediate step and get your comment on that, and I'm sure we'll also hear from FERC. But that is, you suggest that you really could stop right there if you identify the entities that didn't file the reports. But let's just say you identify them. Then — and let's say that FERC disagrees that you can't just stop there. You have to be able to determine, you know, whether reports that would have been filed would have had — whether there would be marked anomalies. So then what is FERC supposed to do? If it were to go — if it wouldn't just stop at step one, as you would like it to do, what would be, from looking at whether something is just and reasonable rate, what would you do second? Well, Your Honor, and let me be clear. We didn't stop there in our evidence. I understand. We put evidence in at FERC that said no seller filed compliant quarterly reports. Right. Number one. And number two, the rates charged were unjust and unreasonable. And here's how we determined that the rates charged were unjust and unreasonable. We took the information, or the kind of information, that should have been in the quarterly reports, and we did analysis of it. And among the analyses are to develop a competitive benchmark that you would expect to see a price in a competitive market of the type that was in California at the time, and compare that to the price that was actually charged. That's one way to do it. Another way to do it is to look in the quarterly reports or the information that should have been there and determine seller margins. What you would see if you did that was that seller margins were unbelievably outrageous. So is the gap in simple terms that's missing here is if you're just doing this, you know, less than 20 percent, you're not then taking into account the information in a quarterly report or the kinds of things that it would show. Well, again, Your Honor, they're two completely different things. That's what I'm saying. They're just two different things. But if you do one, you're not doing the other. Exactly. It's like the preliminary screen is really like the driver's test. And the quarterly report is really like what actually happened when the driver got on the road. The binary proposition, if you go one way, that is the 20 percent test, then you're not going to get to the other. Well, and you're pretending as though what actually happened didn't happen. That's what FERC did here. It pretended that what actually happened didn't happen, which is my point, too, which is that FERC has completely ignored reality here because it has already found that rates during large subsets of this period that we call the Lockyer period were unjust and unreasonable. And it's ordered refunds. So it's not every so it has reached the conclusion in this case that it says it is even though those very same rates charged by those very same sellers, it has determined to be unjust and unreasonable in another case. It's irrational what they've done. They've just mixed apples and oranges and failed to follow this Court's mandate, which brings me to our prayer for a remedy. This Court was deferential to FERC in the first instance and allowed FERC to determine whether there should be refunds in the first instance, but we think at this point it would be appropriate for the Court to order FERC to make a determination as to which sellers failed to file compliant quarterly reports, which they have not done, determine the just and reasonable rates for those sales, which they have not done, and order refunds accordingly. FERC has had two opportunities to do this. Just a few minutes ago you told us that they weren't compelled to order refunds. Your Honor, that's exactly right, Your Honor. And we're asking, we asked it before that this Court order FERC to make refunds, and this Court said no. We're deferring to the agency on that issue. There are all these things that would suggest that refunds are appropriate, but that's the agency's call. We're sending that back to the agency to make that call. So what do we have in front of us now that would change that, that all of a sudden we for sure would say you must order refunds? Your Honor, what we have is the evidence that we put in that shows that the rates are just and unjust and unreasonable. We have FERC's own determinations that it's made time and again in these energy crisis cases that the rates being charged are unjust and unreasonable. And so That's not exactly what we're reviewing here is the problem. That is true, Your Honor. We're reviewing a different proceeding. Right. Okay. My point is simply that in Lockyer what this Court said was FERC didn't order refunds because it didn't think, it says it didn't think it could. So we're going to send it back to FERC to reconsider whether to order refunds. And what we have now is a third time. And we just don't think FERC deserves a third chance. Thank you. Thank you, counsel. Good afternoon, Your Honors. Beth Pasella for FERC. And with me at counsel table is David Frederick who will argue for interveners for five minutes. Let me just start by saying that market manipulation matters. Any concern about market manipulation matters has been addressed in three other FERC proceedings regarding the California energy crisis. The CPUC proceeding, the Pacific Northwest proceeding, and the 2009 complaint proceeding. FERC has adjudicated the matter in all those proceedings. The periods at issue here are completely covered regarding the CSRS transactions and the PX and the ISO transactions, all fully covered. All manipulation matters are in these other proceedings. The Court does not need to be concerned with those, in part because of that, but in an even greater part because the complaint here addresses only reporting violations, and that is all that was sent back to the commission was to determine whether in light of the reporting violations the rates were just and reasonable. The justness and reasonableness of the rates because of manipulation has been addressed by the commission in the other proceedings, and the Court will have an opportunity if parties petition. And in one of the cases, the CPUC 2009, excuse me, the CSRS 2009 complaint proceeding is already before the Court in 12-71956 and 72605. So all we're talking today about is reporting violations. And what was the point of the reporting? Isn't review of the quarterly reports something that was required and required by our decision in Lockyer? Of course. Because it would reveal items that you're telling us are now off the table. No. It was required by this Court because it's required by the Filed Rate Doctrine preliminary or primarily. The Filed Rate Doctrine is only satisfied if, and when I argue that case, it's exactly what I told the Court, and that's what's in your Lockyer opinion. We have to have the market screening that occurs in advance to ensure that an entity doesn't have market power, and then we authorize them to sell at market-based rates. That's not sufficient to satisfy the Filed Rate Doctrine. You need the exact transaction price on file as well with the commission. And so that's the main reason why quarterly reports are filed. It's to satisfy the Filed Rate Doctrine. Well, it's required because the statute requires them. But you have to ask yourself, what is it that we expect to be obtained by reviewing those quarterly reports? Of course. And as I understand what's happened here, FERC has basically rerun its market power screen or market share screen. And I think FERC itself had said in the May 2002 order that the reports were important for reasons broader than that. Sure. Absolutely. And the commission explains that. The ALJ explains that, and the commission explains that as well in the orders before the Court here. At the time these transactions occurred, if proper quarterly reports had been filed and they indicated that there was market power concerns, the commission would have rerun a hub-and-spoke analysis, just like it does. Well, stop right there. Why is it limited to rerunning the hub-and-spoke analysis that it had done in advance? Because market forces may not be brought to bear properly for reasons other than somebody having too big a share. Sure. That's absolutely right. But this is only for quarterly reporting purposes. The commission didn't rerun hub-and-spoke analyses in the CPUC case or the Pacific Northwest case. I haven't made my question clear. The reporting is required. FERC has presumed that the review of the reporting is going to be limited to rerunning the analysis that it did in advance, and I don't understand that at all. That's because, Your Honor, if I may. That's because what the commission does is it looks at the quarterly reports to determine whether there are indicia of market power. And if there are indicia of market power, and that's the case. Well, isn't that too narrow? I mean, I look at what we said in our Lockyer decision that would enable FERC to determine whether the rates were just and reasonable and whether market forces were truly determining the price. Sure. Absolutely. And that's step one. Look, no one talked about the hub-and-spoke. Step two. It sounds like all that was done is a rerun of the hub-and-spoke analysis. But there are other things that could deter or prevent market forces from actually determining a just and reasonable price, and it appears that FERC closed its eyes to all the other possibilities. Since 1980, that is how it was done at the commission. It's no longer done that way. Stop. Stop. That's how it was done in advance. No. No, Your Honor. That's not the only time. FERC has never done anything else in reviewing quarterly reports than rerun its hub-and-spoke analysis? No. And let me — perhaps I'm not making myself clear. As the commission explained at, for example, California ER 127, paragraphs 28 and 29, and other places, quarterly reports help the commission monitor for indicia of market power. Here, the commission already knew there were indicia of market power when it ordered the hearing. It didn't need to go back and look at the quarterly reports to determine should we order a hearing to figure out whether there actually is market power. That step was already completed in this proceeding. It went back to the commission with that step done. There was no need for the commission to look at quarterly reports to determine whether to further investigate. It was already further investigating. The next step that the commission had been doing for decades was, if such indicia are present, which the commission explains in paragraph 28 at Cal ER 172, for example, another analysis of the seller's market share is conducted to determine whether the seller has actually gained market power and, therefore, can charge unjust and unreasonable rates. The way it works, and as this Court has affirmed more than once, the way that the commission determines whether rates are just and reasonable for market-based rate purposes is whether — by ensuring that both the seller and the buyer don't have market power. If you don't have market power, rates are presumed to be just and reasonable.  Presumed. Right. Is that a conclusive presumption? It is. It is for purposes of violation of quarterly reports. It's not for purposes of manipulation. And that's why the hub-and-spoke test is not just run there. We don't blindly say, oh, people didn't have market power under the hub-and-spoke analysis, and we're just closing our eyes to actual evidence of manipulation. We looked at all of that evidence of manipulation. But what the commission does for purposes of quarterly reporting violations, this specific tariff violation, not other tariff violations addressed in the other proceedings, is to rerun the hub-and-spoke test. And if you look, for example, at Petitioner's excerpts of Record 510, paragraph 38, which is a declaration of its witness attached to the hearing request of 122 FERC, they — that witness explains the effect of failing to report required transaction data was to deprive the commission of information useful in monitoring sellers' behaviors that might have prompted further investigation by the commission. This was that further investigation. So the commission — What's this? This, the running the hub-and-spoke, that is — That's it? Yes, because that's how the commission determines whether rates are just and reasonable. That's not the standard that's in effect anymore, but it was the standard that was in effect from the 1980s through the California energy crisis period. That's now been changed. So what means that by — are you telling me that the rates charged were just and reasonable, period? No. I'm telling you the rates charged were just and reasonable for quarterly reporting violation purposes. The commission has found the rates — I don't understand what that means. When the commission looks at whether an entity has — when, as this Court has affirmed time and again, and the D.C. Circuit as well, for example, in Montana Consumer Council, at 916 to 17, this Court said, in Lockyer, we agree with the D.C. Circuit that neither buyer nor seller has significant market power. It's rational to assume the terms of the voluntary exchanges are reasonable. And that's what the commission does as a base. And so when we're trying to determine whether, as a result of quarterly reporting violations, rates were unjust and unreasonable, the commission reruns the hub-and-spoke analysis in the time that — that — not — it's not just relying on the original hub-and-spoke analysis that was run when they were granted market-based rate authority or even the — or the hub-and-spoke analysis that was run for their triennial rerun, because that's what the commission uses every three years is a market screening. Again, it applies that again just to ensure the rates remain just and reasonable because they don't have market power. Yes, Your Honor. Ginsburg. I think the — I don't think it's a semantic difference, but as I understand the California party's argument, they're saying, in fact, there's a disjunction between what you get — what you can get out of the quarterly reports and this hub-and-spoke analysis, and that, you know, has some appeal, if you hear it, because FERC said that these — after — they said earlier, before this case, that the quarterly reports — after the fact, quarterly reports provide a means for spotting price trends, discriminatory patterns, or other indicia of the exercise of market power. Right. And then after that, all we hear is that these — these reports are used for indicia, but it doesn't talk about price trends, discriminatory patterns, or anything else specific. So how do you account for that language change? Is it just — It's not a language change, Your Honor. It's just the commission's language in prior orders, for example, in the Enron proceeding, that was where Enron was coming to the commission saying, you don't need to require us to file quarterly reports. And the commission said, yes, we do, first, of course, because of the filed rate doctrine, and second of all, because we need to be monitoring what's going on in the market to be looking for indicia of reliability and make sure rates are J and R. The commission didn't go on to tell the full story in that order because it wasn't necessary. It didn't say anything. But now it's only telling part of the story. In other words, we're taking, like, some subset that's not matching between what you can divine from those reports that might make you or assist in coming to the final decision versus taking a sort of an almost categorical approach. It's because, as this Court and the D.C. Circuit have affirmed, rates are just unreasonable if parties don't have market power, if the buyer and seller don't have market power. And so that's the way the commission — and the commission — and I said this before, I think, and I'll say it again if I didn't. If during the period in question the commission had the proper quarterly reports and had seen an indicia, by looking at the reports of the actual transactions that had seen an indicia of market power, it would have taken the next step to further investigate by running the hub-and-spoke analysis to see if any entity had gained sufficient market share so that there was — it showed that they no longer could be presumed to have just — be charging just and reasonable market-based rates. So are you — let me understand, see if I understand what you're saying. Are you saying that, in fact, here, FERC did take the quarterly reports and look for anomalies? And if it found them, then it would go do this market share? That's what would happen in a normal — that's — if proper quarterly reports had been filed, that's what would happen. But that didn't happen here. Right. So what happened here was the case came back to the commission with that first part already done. You need to further investigate whether the rates are just and reasonable because there are market power concerns. So why would the commission, as we explained in our brief, the commission, if it were to do this quarterly report analysis, it would be taking a step back. It already was ordering the hearing that would be ordered, if it were, to have looked at the quarterly reports and seen a problem. The next step would have been to order a hearing, which is what happened here, to do an analysis under the screening for the hub and smoke to make sure that no — any entity who hadn't filed their quarterly reports properly hadn't gained sufficient market power, that there were market power concerns, so you no longer could rely on that reasonable presumption. I guess what I don't understand is the apparent equivalence of just and reasonable equals nobody has too big a market share. Is just and reasonable only about market share? The — for presumption purposes, yes. Well, presumption in advance. But we're now talking about a retrospective review, which we said is an essential part of the process. But everybody understands, and I think Petitioners understand as well, that's the — because that's the same analysis that's done in the triennial, the every three-year market analysis. That's what's been — Are you answering my — are you answering my question, yes, just and reasonable equals nobody has too big a market share? Yes, Your Honor. And that's conclusive? That's — it's conclusive, except when we have concerns like we had with the manipulation, other matters, it's conclusive for purposes of the quarterly reporting violations. But the Commission didn't stop there in this California energy crisis larger concern. It looked at very — all kinds of specific — I mean, incredible reams and reams of evidence. Are you telling me anything other that the problem is solved over in this other case that hasn't made it to us yet? The manipulation part of the concern is fully addressed in all — in those other three proceedings. That's right, Your Honor. The quarterly reporting, the quarterly reports were allowed to be considered in those proceedings, but not the quarterly reporting violations, because those were addressed in the proceedings. So what good was the remand in a way? I mean, what role did the quarterly reports play in the remand? At the time of this proceeding, Your Honor, the Commission — the Court had not — at the time of Lockyer, the Court had not yet ruled in CPUC and had not sent back anything for manipulation purposes. The California parties had not asked the Commission to look at manipulation matters. None of that had come up. None of the manipulation matters were before the Court or in this complaint proceeding asked to be addressed by the Commission to broaden the scope. That didn't happen until after the remand here. And then the CPUC decision came out where the Court sent the case back to the Commission to look at manipulation. I see that I'm getting into my intervener's time, but I would like to finish. Then this CPUC proceeding occurred, and this Court sent it back to the Commission for the Commission to — under FPA Section 309 to look at these market tariff violations and market manipulation and to do that for this same time period as is at issue here, the summer period, the pre-October 2000 period. And then before — then the Court heard the Pacific — excuse me, the Port of Seattle proceeding, and that involved the CSRS transactions. The Court sent it back to the Commission to address the CSRS transactions, and that's also part of the Lockyer proceeding for quarterly reporting violations, but the manipulation matters were fully addressed in the Pacific — on remand in the Port of Seattle proceeding. And then in 2009, petitioners say at the invitation of the Court in CPUC opinion, they filed a new complaint a few years later asking the Commission to look at all the CSRS transactions for manipulation and reporting violation purposes. So if I hear you correctly, what you're basically saying is, okay, we read what you said in Lockyer, but in our view, meaning FERC's view, there were intervening events and proceedings, and therefore we can basically ignore the part about how the reporting requirements are going to fit in or what you can learn from the reports would fit into determination of a just and reasonable rate. I don't think that that's what I'm trying to say, and I hope that's not what I'm saying. I think it's different. What the Commission did was handle each complaint, each issue raised in a complaint and — or what was sent back to the Commission on remand. And here in this proceeding was quarterly reporting violations where the Commission uses the hub-and-spoke test. That's just what happens. The purpose of the quarterly reports, again, is to satisfy the file rate doctrine, to give something to the Commission to look at, to determine whether there might be a problem in the markets. And if the Commission finds there's a problem, it'll further investigate by applying the hub-and-spoke analysis at the time. It has different analyses now. So that's what I'm trying to say. This case was covered there. I'm just trying to allay any concerns that Petitioner's reply brief in particular spends a lot of time talking about manipulation matters, and I just want to make sure the Court understands it's not before the Court, but you shouldn't be worried about it anyway, because you can't. Roberts. Well, why isn't it before the Court? Suppose review of the quarterly reports would have revealed patterns of prices that suggest manipulation, but FERC has decided not to review the quarterly reports for that purpose, to limit its review to hub-and-spoke and leave to this other proceeding. I mean, the question I asked you before, is it your answer that the problem here is really taken care of in this other proceeding? For that purpose, yes, Your Honor. For purpose of any manipulation concern the Commission would have had here, manipulation concern the Commission would have had here, not just a market share concern, but manipulation concern that the Commission would have had here has been addressed in the other proceedings. Those have been fully adjudicated. And how would we possibly know that? How would we, yes. We just take your word for it? No. I think that we have the 28-J letter with opinion 536. No, I understand that. As we talk to the specific transactions that California is contesting with evidence and seeks to present in this case, we have no idea whether or not those specific allegations are addressed in the other case, do we, as we sit here today? They tendered evidence. They wanted to tender evidence in this case. We have no idea whether that evidence was before FERC in the other cases or not. Well, I think that I can tell you that, for example, in the CPUC proceeding, that proceeding addressed tariff violations and manipulation, including withholding of generation, false import, cutting nonfirm power. I have a long list, and that's coming. No, it doesn't tell me anything. I mean, that's where my question was going, is that it's like it took on a life of its own after we issue our remand. So it seems to me that we're left in this gap position where we're being asked now to say, was there a remand filed? Well, the answer is probably no, because at least what was written there, what didn't happen. But you're saying, well, don't worry about that, because, in fact, it happened in proceeding B, C, and D. That's kind of what you're saying, right? That is exactly what I'm saying. First, I'm saying that the claim. Help me out, then. How is it that you can just, meaning FERC can just take a case which has gone through this Court with a specific remand order, and then unilaterally decide, well, we've already addressed this elsewhere, and therefore we don't have to address it? I mean, what's the authority? Because that's not what happened here. I'm just letting you know that I'm, I, as an appellate attorney, am letting you know that you don't need to be concerned about that. The commission's orders do explain that the matter is. Well, that's not making me very comfortable. But, well, no, the commission's orders explain that the reporting violations are addressed in the reporting violation complaint. That's all that was raised. But we asked you to do something. You didn't do it. And then you say, well, we're doing it over here, so it doesn't matter. But you, but what the Court asked the commission to do is go back for, well, this is what the Court asked the commission to do in the proceeding. You asked the commission to go back. Let me find that. You asked the commission to go back and gauge the justness and reasonableness of the rates. Petitioner's brief says the same thing. Gauge the justness and reasonableness of the rates in light of these reporting violations. We don't have to, because nobody had market power, which we knew at the time of the first hearing. I'm sorry, Your Honor. It's not that we don't have to. It's that the way that we do that is by ensuring that nobody had. But there would be no point to the remand in the first instance. We knew that back all those years ago, didn't we?  We had no idea.  Market share concerns were never addressed. All the Court knew was that there were problems, and all the commission knew at the time, was there were problems with pricing in the markets, and there, by the time this case, by the time the complaint was filed, there were, there was information out there that there had been manipulation in the market, but this complaint didn't mention the term manipulation. All it said was these, really the complaint was about the filed rate doctrine, and they didn't file proper quarterly reports. The filed rate doctrine, market power isn't okay. Market-based rate authority isn't okay anyway, and they didn't file proper quarterly reports, and filed rate doctrine is not satisfied. And they asked for refunds of the difference between the just and reasonable rate and the rate that they paid. So the commission looks and said, let's figure out who didn't file their quarterly reports properly for purposes of affirming the summary judgment and for finding the summary judgment. The ALJ presumed, in light, most favorable to the Petitioners. They, it was presumed that no one properly filed their quarterly reports here. But so what do we then do? We then determine that any rates that resulted from a circumstance when nobody had too big a market share were just and reasonable. And the commission had been doing that for decades, and that is, again. But given that you've acknowledged that there can be rates that aren't just and reasonable because of factors beyond market share, such as the manipulation that went on as the subject of the other action, I'm kind of lost as to why it is we're supposed to assume it must be just and reasonable because the commission said for the purposes of quarterly rate review, it is. What logic is there in that? Because the commission had the Lockyer complaint here. It had the CPUC complaint, which raised manipulation matters in the CPUC complaint, and it had the CSRS-2009 complaint, which raises manipulation matters. This is the only proceeding where manipulation matters weren't raised, even though people knew already that there were the staff report about concerns about market  As a matter of fact. Roberts, but this proceeding raised the failure to make the required quarterly reports, a review of which the California parties argue would have revealed manipulation and would have revealed rates that were being set other than through the exercise of proper market forces. And all of those matters have been addressed. And I don't. But not here. Not here. Well, I understand that, but that's because this Court will have an opportunity if the parties feel they are aggrieved, if the Petitions feel they are aggrieved, then they can bring this to that Court. California parties think this is the opportunity. But this isn't the opportunity. For example, in their complaint. Their complaint is that the rates were not just and reasonable. There are lots of reasons that can be true. Their complaint was that the rates weren't just and reasonable because there were reporting violations, Your Honor. For example, let me use. Therefore, there was no effective tariff in place because a market-based tariff is dependent upon quarterly reporting. So they're saying, well, without an effective tariff in place, you have to determine what the just and reasonable rate is, and we get the difference if the just and reasonable rate and the market rate were different. That seems pretty simple to me. Let me point you to FERC excerpts of records 35 to 36, which is Petitioner's complaint. And in that, on that page, those pages, they say, quote, that proceeding, the CPUC proceeding, does not involve the same legal and factual allegations raised here, i.e., that California wholesalers have failed to file their rates as required,  clearly said to the commission, we are raising different issues in the CPUC proceeding than we are raising here. They separated it out from the beginning. They chose how they were going to set up their complaints, and they set up the subject matter of each of their complaints, and the commission addressed them seriatim, and the entire body is taken care of. And the commission said time and time again, these are separate proceedings. The commission gets to set its own procedures, and setting your procedures in the way that they are set up by the complaints filed by the Petitioners is absolutely reasonable. Roberts. Our questions have taken you over your time, but, Mr. Frederick, I'm sure you can. Thank you. May I just ask one more question before you leave? We're all being paid overtime today. That's okay. So you said they were able to raise these issues elsewhere, but the ---- if we were ---- if we affirm on this appeal, where will they raise them elsewhere? Where will they raise? Well, the issues you just told me, these can be raised elsewhere. They've already raised them elsewhere. Those are already ---- they've all been adjudicated at least through ---- excuse me, they've already been adjudicated either fully by the commission and are pending right now before the court. The CSRS 2009 complaint proceeding, again, in 12-71956 and 72605 is just sitting waiting for the court to review. It's at abeyance at Petitioner's request. And the Port of Seattle proceeding has an ALJ decision has been issued on the manipulation matters in this ---- during the entire CSRS time. So can you just explain something? Because, you know, we've had a lot of these cases, so exactly how they interrelate is not maybe as obvious to us as it is to you. So this is the State of California, correct? I'm sorry? This is the State of California that we're looking at here, the Petitioner? Yes. Okay. So where ---- if we affirm here, then are you telling me that because the manipulation and other issues were brought up in other dockets which have not yet been appealed or have been ---- Yes, right. That are already before the court. Right, right. Or are out there floating around still, that when all that comes to fruition and there's a final decision out of the circuit or a decision not to appeal something, that the results of that would in effect flow to these parties before us today? They're all the same Petitioner. I mean, California is in each of the proceedings. In each of the ones you're talking about.   Yes. They're all California complaints. Some have other parties, but they all have California. And so the question I'm still having, though, is what gives FERC the authority if we tell it to do something, to say, well, I don't really need to do what you're telling me, because in fact, at least not in this proceeding, the one that's come back on remand, you know, we know we don't have to issue refunds, but we're going to take a look at it, but we don't have to do it how you told us, because we actually have all these other places that this is being played out. I think that it really comes down to the main point here is that if the proper quarterly reports had been filed at the right time and the commission had looked at them and they indicated a problem, the commission by the commission would have looked at the reports, the commission would have seen a problem. If it had, it would have done exactly what it did here, which is order a hearing for the hub-and-spoke analysis. So all the commission did here was exactly what it would have done if things had been done properly back then. And the commission had been doing it that way for decades. This isn't new. And it's the same procedure the commission would have done in a triennial review. That's how the commission determines whether rates are just and reasonable and market-based rates. And you had indicated, of course, you said when you stood up early on that rates are just and reasonable if there's no market power. Right, Your Honor. But then later in response to Judge Clifton, I thought I had heard you say, well, in fact, that that might not reflect completely the landscape for just and reasonable rates because there may be other anomalies. So did you say both of those, and how do they get reconciled? I did say both of them, only in that because when you have a quarterly reporting violation, you are figuring out whether the rates are just and reasonable for purposes of this quarterly reporting tariff violation. It's a violation. It's just one type of tariff violation. The commission addresses that one way. The commission in the CPUC proceeding and in the other proceedings that I've mentioned this afternoon addresses manipulation matters differently. It looks at each individual seller and it determines whether that seller manipulated and it determines whether that manipulation affected in the PX and ISO proceedings, whether it affected the market clearing price, and if it did, it orders that seller to give refunds. That's how that works. In the CSRS transactions, those are bilateral contracts. The commission looks at the individual contract, applies the Morgan Stanley analysis of the presumption of contract rates, and again goes individual by individual to see if the manipulation affected the contracting price at the outset. For the clarification. Thank you. Thank you, Counsel. We'll put five minutes on call for Mr. Frederick. I think it's really important to keep in mind the difference between market manipulation on the one hand and market power on the other. This case, because of the nature of the complaint that California chose to bring, is all about market power. They chose not to assert anything about market manipulation. You can read the complaint. It is clear. Even though Enron bankruptcy and the commission had already started to investigate manipulation, California chose in March of 2002 when they filed this complaint not to bring allegations about market manipulation in this proceeding. And so that's why when FERC on remand was looking at market power, that is a distinctive issue, and it asked the Cal Parties to do the market power test as you had instructed in order to comply with the tariffs to ensure that there was not market power and that market power was the cause behind the high rates. California chose not to comply with FERC's order. It did not put in the evidence that FERC required to determine market power. And it never has come up with a theory for why these quarterly reports would tell us anything that would be important to the rate structure. Now, if we look at the facts, Judge Clifton, and I think it's really — Well, I think they've offered at least two theories. One is a generic, the rates were not lawful because they didn't comply with the second part of the two-part requirement from the market-based rate approach. And the second is that review of these quarterly reports would have disclosed market dysfunction in some fashion that should have been pursued, leading to the conclusion that the rates were not just and reasonable.  Okay. And let me dispatch with the second part first, because if you look at the facts here, prices rose, and I'm just going from, Chief Judge Thomas, your opinion in the CPUC case. The rates started to rise in May of 2000. For the second quarter, the quarterly report, it would be due on July 31, 2000. Well, two days later, San Diego brought its complaint that triggered all of the FERC investigations. The quarterly report for July 31, 2000, which was the first time FERC would have gotten the indication in a quarterly report of pricing anomalies, was already subsumed by actions that the Commission was taking to investigate. And so in CPUC, when this Court said that there cannot be retroactive refunds for that summer period, you have to look at tariff violations. That's what the Commission ended up doing for this same 2000 summer period by looking at whether or not those violations of reports would have then led to manipulation based on the way the rules of the market had been set up. And so as a consequence, what's happened in the CPUC proceeding, and this is the FERC opinion that was referenced in the 28J letter, has gone through and identified the proof of the manipulation of the rules that would have led to a pricing differentiation that would lead to refunds based on that, and you will have an opportunity to review whether the Commission got that right or not. But they still, the Cal Parties still have no theory about which that temporal sequence would lead to change. Now, on the first part of your question, Judge Clifton, the reason why that's incorrect is because the pricing data that is in the quarterly reports gives price and location and seller information so that the Commission can determine market power at a particular point in time with respect to particular sellers and a particular location of the market. The Cal Parties have trotted up economist after economist before the Commission, and they have never once made the nexus link between a deficiency in the report and a link to market power being the cause of the high prices that were paid. Okay? If you look at the Commission's March ---- Alitos, or Commission make that finding? Yes. The Commission did in its March report, and this is at page 207 of the excerpts of record, where the Commission said, It is not clear on the record developed thus far that there has been any demonstration of a nexus between a particular seller's reporting failures and any gain in market share that would have given that particular seller the potential to exercise market power. So if you look at what this case is supposed to be about, market power, because this case cannot allow a retroactive refund that would be market-wide, that would not be in violation of Section 206 of the Federal Power Act, you have to necessarily go to whether or not any deficiency in the report would have led to an unjust and reasonable rate. And the answer is no, because they've never given a factual nexus that would lead to that conclusion. And, Chief Judge Thomas, in your CPUC opinion for the Court, you instructed that the violations of the tariffs would lead to their own remedy, and that is what is being done in the CPUC and in the Puget proceeding and in the 2009 California complaint proceeding. And it's really important that you keep in mind that the way these cases work is the complaining party defines the scope of the proceedings, and that is what gets litigated through the regulatory process and then on appeal. And I appreciate this Court's desire to resolve what it can resolve about the California energy crisis in one fell swoop, but that's just not the way the process works for the proper administration of regulatory proceedings. But we know that, because that's why we're hearing case after case and groups of cases and why cases are still out there pending. I wish that I could say that the sellers had something to do with that. But the complaining party here defines the scope of what it wants to complain about in the time period in which it brings that complaint, and they are the ones who have done this in a piecemeal fashion. They chose, when they finally decided to ask for consolidation and they couldn't persuade the commission to do it, they petitioned for review to this Court and then didn't ask for you to act on that. You have to wonder why. And it's because their theory doesn't comport with ironclad, black-letter administrative law principles of the way reviewing courts are supposed to deal with administrative agencies that are charged with doing these. Now, Judge Clifton, I appreciate that you're looking at this and you're saying, Mr. Frederick, how can I trust you? The opinion, FERC opinion 536, that was the subject of the 28J letter, goes through in a lot of detail the specific tariff violations for this period of time, and it comes to conclusions about whether or not particular violations gave rise to rates that were unjust and unreasonable. But for purposes of market power, which is what this case is about, California has never made its showing about Nexus because it never has put in the evidence to take the way FERC would do this in this 2000 to 2002 period and actually do it in a way that would have given proper notice to the sellers. And you can't, 15 years later, just to say we're going to blow up the rules and do it all over again just because it feels good. There is an administrative law principle here. There are reviewing court principles here that you are bound by. And when the Supreme Court in the Morgan Stanley case said that just because there was market dysfunction doesn't mean that you can abrogate contracts, it was making clear that you had to look at specific misconduct by the sellers. And that's what those other proceedings are doing in excruciating detail, months and months and months of hearing practices before ALJs, voluminous testimony that's being generated. And that just has not caught up to this particular case. Thank you, counsel. Your rebuttal? Your Honor, I only have a minute. Well, we'll give you four. Thank you. We'll give you five minutes. We'll give you five minutes on the clock. We gave your opponent some extra time. First on the issue of other proceedings, the California parties have striven to get refunds for California consumers for all of the unjust and unreasonable rates that were charged from May 2000 through June 2001. And there are several cases in which those are being pursued. And the cases overlap, and it's confusing, and I understand that. But as Mr. Frederick alluded to, we actually asked FERC to consolidate these cases so that some of the evidence that obviously is relevant in all of the cases could be presented. So, for example, so that we could take the quarterly reporting violations that you identified here in the Lockyer case and have the commission consider them along with other things in other cases. The commission refused to do that. The sellers resisted it. So the main point that I want to make is what we are trying to do and have been trying to do is make consumers whole for all of these transactions. And we certainly wouldn't want a duplicative remedy. But what's very clear is that the remedy that we need in this case is not being satisfied by any of these other cases. It may possibly be in part, but there are particular entities in this case, for example, Allegheny and Merrill Lynch and Commerce, three plaintiffs whose counsel are sitting here. And these particular entities are not involved in the summer case that resulted from your CPUC remand. They're not involved in the Puget case that resulted from your CPUC remand or from the Puget remand. And so this, it's not being made better in other cases.  And so we're going to have to look at the way in which FERC has handled this, because what FERC has done is essentially create a shell game where we try to put in evidence in one case and they say, no, no, no, we're going to look at that evidence in another case. Or we try to get a remedy in a particular case and they say, no, no, no, you can only have that remedy in the other case. And then we never get the remedy. So all we're asking for is to be made whole. Sotomayor, would you address the nexus argument that was made, please? Well, Your Honor, the nexus argument I've never understood, because the fact is, I think in this case, what the Lockyer opinion says, and this is very important, because the Lockyer case covers the entire period. So this case has the ability to solve the entire crisis. And what the Lockyer opinion says is if sellers didn't file compliant quarterly reports, and none of them did, the rates weren't lawful. And if the rates weren't lawful, the commission should determine what the just and reasonable rate is. There's really only going to be one just and reasonable rate. I'm not sure what counsel for FERC means when she says we're looking at the just and reasonable rate for purposes of quarterly reporting. Judge Clifton asked her about that. Suppose you've got somebody who did file a quarterly report, but their rate, because of the way this market worked, is going to be the same as everybody else's. So they're off the hook, right? Because they didn't fail to file the required report. That's correct, Your Honor. Okay. So what you're really trying to say is that somebody who might be the innocent beneficiary of monarchic manipulation by others, if they file their reports, they're off the hook, but if they didn't file the report, they're caught. That's exactly right. For the purposes of this case. For purposes of this case. And to put a further gloss on it, we have evidence, most of the sellers conceded that they didn't file compliant quarterly reports. So why should filing the reports have such significant impact? If, in fact, there's not a showing, and FERC has suggested a lack of nexus, and I confess I'd have to look at that more carefully, but they did say that the California parties haven't shown that the quarterly reporting had an impact. Is there? Oh, no. Your Honor, we put in very detailed evidence. It's in the further excerpts of record. FERC doesn't seem to think so. It's in the further excerpts of record. It's a very thin volume that you have. It's Mr. Taylor's testimony. He explained in detail what FERC could have done with compliant quarterly reports in the way of detecting and curing the problems in the market, and that included manipulation and included all of the things that we know that happened in the market. Had FERC actually been ‑‑ had they been getting compliant reports and using them, they could have gotten to this point much earlier. But the real point on the remedy is that the Court has the ability at this point to just simply say if the rate ‑‑ if the report wasn't filed, then the rate's unlawful. And if the rate's unlawful, FERC has to determine the just and reasonable rate. And that doesn't mean there's going to necessarily be reasons. We've got the ability to say that, but that kind of raised the question. Why should the filing requirement have such an impact if, in fact, unless we have to go back to the question of which you say there is evidence, but FERC doesn't seem to have rendered a judgment with regard to whether, in fact, the quarterly reports, if properly filed and properly reviewed, would have led to that kind of disclosure. We don't know that, do we? You may argue that there's ‑‑ Well, we have evidence that says ‑‑ Yeah, but that's something different. You've got evidence. There's lots of evidence floating around there. We've been told the other proceeding takes care of everything. We don't know any of these things. I understand, Your Honor. But I guess what I would say is that FERC itself from the get‑go in the quarterly reporting system said we need these reports because we can tell from them whether there's market manipulation, we can tell from them whether there's market power, we can tell from them. That's why we need them. And you repeated that language back to them in your Lockyer opinion, and when you sent it back, they just decided they were going to ignore the opinion. But then they say, as a matter of broad principle, if there's no market power, then you have a just and reasonable rate. But that's obviously not true, Your Honor, if FERC is finding in other cases that the rates were unjust and unreasonable, which they have. They have done that. There can't be ‑‑ the same rate can't be both just and reasonable for one purpose and unjust and unreasonable for another. And that's what FERC is saying.  I don't think that's what they're saying. Except that the party ‑‑ the seller who filed reports is off the hook. You've acknowledged that. Well, that's essentially a trap in the way the Federal Power Act would work, Your Honor, and we're willing to live with it. And under these circumstances, it doesn't make any difference because there isn't a single seller who filed a compliant quarterly report. So none of these rates were properly filed, and that was the language that FERC itself used, and you quoted back to them in your opinion. You know, FERC said we need ‑‑ and you actually heard counsel for FERC say it. We need these reports on file so that the rates will be filed. Well, if the rates ‑‑ if the reports are not on file, then the rates are not filed. And if the rates are not filed, then they're not lawful rates. And if they're not lawful rates, FERC can look and see whether they're just and reasonable. And if they're not just and reasonable, there should be refunds. And that's our position. I'll say one other thing. Well, wind of a nail, the kingdom was lost. You've got lots of dominoes falling there. I just want to make one small point, and that is that counsel for FERC said that for decades, when FERC has thought on the basis of a quarterly report, saw indicia of market power in a quarterly report and has thought that there might be market power and has investigated, what they've done is rerun the screen. And she said several times that they've done this for decades. If you look in their brief, you won't see a single cite to any case other than the opinions in this Lockyer case on remand. And it's because they made it up in response to your opinion. Thank you, counsel. Thank you all for your arguments today. The case will be submitted for decision and will be in recess. All rise. The United States Court of Appeals for the 9th Circuit now stands in recess.
judges: Thomas, McKeown, Clifton